# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

CURTIS PARKS,

    *Petitioner*,                              CASE NO. 05-CV-10036

v.                                         DISTRICT JUDGE DAVID M. LAWSON
                                             MAGISTRATE JUDGE CHARLES E. BINDER

MILLICENT WARREN,

    *Respondent*.
_____/

JOSEPH AMBROSE,

    *Petitioner*,                              CASE NO. 06-CV-13361

v.                                           DISTRICT JUDGE THOMAS L. LUDINGTON
                                             MAGISTRATE JUDGE CHARLES E. BINDER

RAYMOND D. BOOKER,

    *Respondent*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## AFTER EVIDENTIARY HEARING

### I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Petitioners' claims that they were denied their Sixth Amendment rights to a fair and impartial jury drawn from a fair cross-section of the community be allowed to proceed because Petitioners have established a *prima facie* case.

**II.     REPORT**

    **A.     Background & Procedural History**

These habeas corpus cases are being considered together for purposes of holding an evidentiary hearing and issuing a Report and Recommendation ("R&R") regarding the common issue raised in each case: whether the respective jury venires violated each Petitioner's Sixth Amendment right to a fair and impartial jury drawn from a fair cross-section of the community. (Parks, Doc. 50 at 2; Ambrose, Doc. 22 at 7.)[1]

Petitioner Curtis Parks ("Parks") is a Michigan state prisoner currently confined at the Gus Harrison Correctional Facility in Adrian, Michigan. Parks was charged with three counts of criminal sexual conduct in the first degree. On October 18, 2001, following a jury trial, Parks was convicted on all counts. On November 29, 2001, he was sentenced to 15-40 years on each of the three convictions, to be served concurrently and not consecutively. Parks filed the instant Petition for Writ of Habeas Corpus and a motion for evidentiary hearing on February 2, 2005. (Doc. 1, 2.) On April 7, 2005, Judge Lawson denied Parks' motion for evidentiary hearing. (Doc. 5.) Judge Lawson referred pretrial matters to the undersigned magistrate judge on November 28, 2005. (Doc. 18.) On April 17, 2006, an R&R recommending denial of the petition was filed. (Doc. 19.) On March 6, 2008, Parks moved to amend his objections to the R&R. (Doc. 27.) On July 31, 2008, Judge Lawson adopted in part and rejected in part the R&R and referred the matter to the undersigned for appointment of counsel and for an evidentiary hearing. (Doc. 30.) On October

---

[1] Since the evidence presented at the evidentiary hearing is the same in both cases, references made to the evidentiary hearing transcript will be made to the Parks docket. References to docket entries particular to each individual petitioner will be to each petitioner's individual case.

10, 2008, Judge Lawson denied Parks' request to amend his objections to the R&R. (Doc. 31.) Counsel was appointed for Parks on October 15, 2008. (Doc. 32.)

Petitioner Joseph Ambrose ("Ambrose") is a Michigan state prisoner currently confined at the Pine River Correctional Facility in St. Louis, Michigan. Ambrose was charged and convicted by a jury on April 19, 2001, of two counts of armed robbery, one count of carjacking, and one count of felony firearm. (Doc. 16.) On June 19, 2001, Ambrose was sentenced to 15-60 years' imprisonment for each of the armed robbery convictions and 10-50 years' imprisonment for the carjacking conviction, to be served concurrently, and two years' imprisonment for the felony-firearm conviction, to be served consecutively to the other sentences. (Doc. 15.) Ambrose filed a Petition for Writ of Habeas Corpus on July 25, 2006. (Doc. 1.) On June 16, 2008, Judge Ludington referred the case to the undersigned to hold an evidentiary hearing. (Doc. 22.) Counsel was appointed for Ambrose on October 15, 2008. (Doc. 25.)

After the attorneys agreed that the cases should be considered together for purposes of an evidentiary hearing, several status conferences were held with the attorneys and the attorneys' requests for extensions of time to prepare for the hearing were granted. On October 26, 2009, the evidentiary hearing was held. Respondents filed motions for stay pending the United States Supreme Court's decision in *Berghuis v. Smith*, 543 F.3d 326 (6th Cir. 2008), *cert. granted*, ___ U.S. ___, 130 S. Ct. 48, 174 L. Ed. 2d 631 (Sept. 30, 2009). Judge Lawson denied the motion for stay and referred the case to the undersigned for completion of the R&R on November 13, 2009, in the Parks case. (Doc. 51.) Judge Ludington denied the motion for stay in the Ambrose case on December 11, 2009. (Doc. 47.)

On December 16, 2009, the Court entered an order regarding the supplemental briefing schedule, requiring briefs to be filed by December 28, 2009, and any replies to be filed by January 13, 2010. (Doc. 48.) Supplemental briefs have been filed by all parties; thus, the matter is ready for Report and Recommendation.

### B.     Jury Venire – Fair Cross-section Standards

In order to establish a *prima facie* violation of the Sixth Amendment's right to a jury representing a fair cross section of the community, a petitioner must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community [cognizable prong]; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community [underrepresentation prong]; and (3) that underrepresentation is due to systematic exclusion of the group in the jury-selection process [systematic exclusion prong]." *United States v. Ovalle*, 136 F.3d 1092, 1098, n.7 (6th Cir. 1998) (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)). Exclusion need not be intentional to be unconstitutional under the Sixth Amendment's fair cross-section guarantee, but the exclusion must be systematic. *Duren*, 439 U.S. at 368 n.26. Systematic means "inherent in the particular jury-selection process utilized." *Id.* at 366.

If a *prima facie* violation is established, the government is required to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group" in order to rebut the presumption. *Id*. at 367-68.

4

**C.     Evidentiary Hearing**

On October 26, 2009, an evidentiary hearing was held.  One live witness, Wayne Bentley, was examined and several exhibits were stipulated to and received into evidence in lieu of live expert testimony.  Wayne Bentley, a teacher in the Grand Rapids Public Schools, testified that he has been a member of the Kent County Jury Commission since 1998. (Doc. 48 at 14.)  This unique board of three oversees the Kent County jury processes.  (*Id.*)  Mr. Bentley regularly took his government class to the Kent County Circuit Court to "go into the jury assembly room and count the minorities."  (*Id.* at 15.)

Terry Holtrop, case management manager for the Kent County Circuit Court since 2001, testified in a deposition[2] that shortly after he became employed with the court, jury commissioner Wayne Bentley  became vocal about the lack of minorities in the jury pools.  (Doc. 46, Ex. 1 at 6.)  Concern about the racial composition of the venire "came to a head" in September of 2001 after Mr. Bentley's high school class created a report on the issue as part of a class project.  (*Id.* at 9-10.)

The Kent County Jury Management System Report (hereafter "the Report") dated August 1, 2002 (Doc. 46, Ex. 2 at 12),[3] describes the genesis of the computer error described by Mr. Bentley during his hearing testimony.  The Report first indicates that the random number generator used in the County's jury management system functioned properly and therefore, was not the source of any problems.  (Doc. 46, Ex. 12 at 16.)  The Report indicates that in April 2001, the job

---

[2]This deposition was taken for presentation in the Eastern District of Michigan case of *Powell v. Howes*, Case No. 05-71345.  On September 22, 2009, U.S. District Judge Denise Page Hood granted a motion to stay and the case is abeyance so that the petitioner may return to state court and fully exhaust his administrative remedies.

[3]The Report was an exhibit included with Terry Holtrop's deposition.

5

of updating and loading the state files of eligible jurors was taken over by the county as part of a cost-cutting effort. (*Id.* at 15.) The Report explains:

> [I]n the initial set-up of the Oracle database to accommodate the driver's license and State ID data from the State file, an error was made in one parameter. Whether this was a programming error, the carry-over of a setting that existed within the Sybase database, misinterpreting instructions, or simply human error, that is now almost impossible to determine. The parameter that was entered within the database was 118,169. What should have been inserted within this setting was the total number of records in the State File, or 453,981 in 2001.
>
> The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 jurors on the file. The percentage of jurors selected per Zip Code was proportional to the Zip Code composition of the first 118,169 records - but not Kent County as a whole. The total pool of prospective jurors from the State File is of course 3.8 times larger than the 118,169 and hence the type of jury pull data as is evidenced in the various tables included in this report, for the second half of 2001 and the first half of 2002.
>
> The next logical question being, why then did the jury pull from Zip Code 49341 jump so dramatically for 2001, from an average of 3.8% up to 10.24% . . . and why did the jury pulls from Zip Code 49507 decline from an average of 8.56% to 2.13%? The answer being that in 1998 (as was mentioned previously) the State File did not come in random order, but rather in Zip Code order . . . lowest numbers to highest numbers. In subsequent years, new prospective jurors (either based on age or having moved to the County) were added to the end of the database. Existing prospective jurors (those that were on file the previous year) would simply have address information updated based on what the State provided. Their position in the dataset would not change. Therefore, the first 118,169 records of the dataset have a high percentage of lower numbered zip codes. As indicated on the map included in his packet, all the Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.

(Doc. 46, Ex. 2 at 15-16.) The Report indicated that the error occurred from April 2001 through July 2002 and that the error had been corrected as of the date of the Report, i.e., August 1, 2002. (*Id.* at 16.) I note that Petitioner Parks' trial was held on October 15-18, 2001 (Doc. 11) and Petitioner Ambrose's trial was held on April 16-19, 2001. (Doc. 16.) Thus, both Petitioners were affected by the computer error discussed above.

6

Since that time, Mr. Holtrop has conducted and distributed statistical analyses of the racial composition of the Kent County jury pools. (Doc. 48, Ex. 2 at 18.) Mr. Holtrop indicated that sometime after November 2001, the county implemented Commissioner Bentley's suggestion that when a jury questionnaire is returned from a particular zip code, another questionnaire be sent to someone from that same zip code to help increase minority representation. (*Id.* at 13-14.) Mr. Holtrop stated that since the 2002 computer system change to correct the zip code bias, he does not believe that there have been any problems with underrepresentation. (Doc. 46, Ex. 2 at 4.)

A report prepared by Paul L. Stephenson, III, Ph.D., was also submitted. (Doc. 46 at Ex. 4.) Dr. Stpehenson's report was made for Judge Dennis Kolenda of the Kent County Circuit Court and it analyzed the Kent County jury pool for the trial (*People v. Bryant*) held in January 2002. (*Id.*) Dr. Stephenson concluded that the absolute disparity test "result indicates that there is a 6.03 percent difference between the percentage of eligible Black and African Americans in Kent County and the actual percentage in the venire." (Doc. 46, Ex. 4 at 3.)[4] Dr. Stephenson further concluded that the comparative disparity test showed that the Bryant trial "had 73.1% fewer Black or African American members than could have been expected in Kent County." (*Id.*) Dr. Stephenson suggests that neither the absolute nor comparative disparity tests are "viable for inferential purposes" because they are "not capable of identifying whether this group is statistically significantly underrepresented and small changes in the venire representation will unduly distort the analysis . . . ." (*Id.*) Using the standard deviation and binomial tests, Dr. Stephenson concluded that there was "insufficient evidence to demonstrate that the representation of Blacks

---

[4]I note that in *People v. Bryant*, No. 241442, 2004 WL 513664, at *3 (Mich. Ct. App. Mar. 16, 2004), the Michigan Court of Appeals stated that the absolute disparity in that case was 5.08% which did not constitute a substantial underrepresentation, but the court nevertheless remanded the case to the trial court to allow presentation of additional evidence.

7

or African Americans <u>in the venire</u> is biased, this is in part due to the size of the venire." (*Id.* at 4 (emphasis in original).)  After employing the Chi-square Goodness-of-fit test, Dr. Stephenson found that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased.  As a result, there is overwhelming evidence to conclude that the selection process <u>for terms</u> during the first months of 2002 was biased."  (*Id.* at 5 (emphasis in original).)  Dr. Stephenson's summary stated that a "systematic bias did exist in the selection of individuals summoned for jury duty during the first three months of 2002.  This bias would have inevitably led to underrepresentation of Black or African Americans in the terms during this period of time.  However, because the venire in the case of *People v. Bryant* contained at least one  Black or African American potential juror, there is insufficient evidence to conclude that the venire in this case was significantly biased." (*Id.* at 7 (emphasis in original).)

The parties also submitted a report by Edward Rothman, Ph.D., who performed an analysis of the Kent County Jury Pool between January 1998 and December 2002.  (Doc. 51.)  Dr. Rothman's analysis concluded that the period between April 2001 and August 2002 revealed significantly more underrepresentation of African Americans than the earlier period studied. (Doc. 51, Ex. 2 at 7, 9.)  Dr. Rothman found that the absolute disparity between jury-eligible African Americans and those who appeared on jury venires was 3.45% between April 2001 and August 2002. (Doc. 51, Ex. 2 at 2.)  Dr. Rothman further concluded that the comparative disparity during this time period was 42%.  (*Id.*)

**D.     Analysis and Conclusions**

Petitioners have been excused from the procedural default of having failed to object to the composition of the jury at trial; therefore, the merits of the case may be considered.[5] (Parks, No. 05-10036, Doc. 30 at 8; Ambrose, No. 06-13361, Doc. 22 at 5.)

In *Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2008), *cert. granted,* ___ S. Ct. ___, 2009 WL 1370175 (Sept. 30, 2009), the Sixth Circuit considered a challenge to the Kent County jury venire composition during the petitioner's trial in 1993. Although the case involved different issues occurring in a different time period from the instant case,[6] the case presents guidance on applicable principles. In *Smith,* "the absolute disparity between jury-eligible African Americans and those that actually appeared for jury venire panels was 1.28 percent." *Id.* at 337.[7] The Sixth Circuit noted that "[c]ourts across the country have held that absolute disparities in this range are not constitutionally significant for purposes of *Duren's* underrepresentation requirement." *Id.* The court further noted that the comparative disparity, rather than absolute disparity, is "the more appropriate measure of underrepresentation" where the alleged underrepresented group is small. *Id.* at 338. The comparative disparity for the relevant time period was 34%. *Id.* The Sixth Circuit concluded that the comparative disparity figure was sufficient to demonstrate underrepresentation.

---

[5]Several other courts have concluded that procedural default should not be excused under the same circumstances. *See Wellborn v. Berghuis*, No. 1:05-CV-346, 2009 WL 891708 (W.D. Mich. Mar. 31, 2009); *Burros v. Curtin*, No. 1:05cv701, 2009 WL 736066 (W.D. Mich. Mar. 18, 2009); *Davis v. Jones*, No. 1:04-cv-294, 2007 WL 2873041 (W.D. Mich. Sept. 26, 2007).

[6]I note that the issues were Kent County's practice of assigning jurors to district court panels prior to assigning jurors to circuit court panels and the practice of granting excused absences from jury duty for reasons such as lack of transportation or child care that resulted in the disproportionate excusal of African Americans. *Smith*, 543 F.3d at 339. These issues were also discussed by Wayne Bentley at the evidentiary hearing in the instant case (e.g., Doc. 48 at 19-20), and in Terry Holtrop's deposition (Doc. 46, Ex. 1 at 15), but are not relevant to the 2001 trials at issue here.

[7]I note that the Michigan courts also found the absolute disparity to have been 1.28%. *People v. Smith*, 463 Mich. 199, 217 (2000).

9

*Id.* As to systematic exclusion, the Sixth Circuit held that the "lack of random selection in the Kent County jury selection process leads us to conclude that the underrepresentation of African Americans resulted from processes 'inherent in the particular jury-selection process utilized.'" *Id.* at 341 (quoting *Duren*, 439 U.S. at 366).

In the instant case, the first prong of the *Duren/Ovalle* analysis is not contested; African Americans are a cognizable group. The second and third prongs, underrepresentation and systematic exclusion, are contested and are the focus of the evidentiary hearing and this analysis. As indicated above, exclusion need not be intentional but, to be systematic, it must be "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366, 368 n.26.

As to underrepresentation, I suggest that the evidence submitted satisfies the Sixth Circuit standards. Dr. Rothman concluded that between April 2001 and August 2002, the period in which both Parks and Ambrose were tried and convicted, the absolute disparity between jury-eligible African Americans and those appearing on jury venires was 3.45% and the comparative disparity was 42%. (Doc. 51, Ex. 2 at 2.)[8] Although Dr. Stephenson's report covered a slightly different time period, i.e., January 2002, he found a higher absolute disparity of 6.03% and comparative disparity of 73.1%. (Doc. 46, Ex. 4 at 3.) Dr. Stephenson also identified the flaws in both absolute and comparative disparity analyses, employed several other methods, and ultimately concluded that "there is overwhelming evidence to conclude that the selection process for terms during the first months of 2002 was biased." (Doc. 46, Ex. 4 at 5 (emphasis removed).) Since the Sixth Circuit has held that the underrepresentation prong is proven where the comparative disparity is 34%, *see*

---

[8]The absolute disparity for jury-eligible African Americans or Hispanics was 4% and the comparative disparity was 29%. *Id.* I note that Respondents focus on these combined statistics in their brief. (Doc. 55 at 14.)

10

*Smith*, 543 F.3d at 337-38, I suggest that the instant Petitioners have met and exceeded that standard and have sufficiently met the underrepresentation prong of their *prima facie* cases.

I am not persuaded by Respondents' argument that, as indicated in a Table listing cases from the 1st, 2nd, 3rd, 7th, 8th, 9th, and 10th Circuits, "all of the circuits have rejected similar disparities - whether measured by absolute disparity or comparative disparity." (Doc. 55 at 14, Table A.) When our own circuit has spoken, its guidance cannot be ignored in favor of cases from other circuits. *See United States v. Ossa-Gallegos*, 491 F.3d 537, 550 (6th Cir. 2007); *In Re Behlke*, 358 F.3d 429, 435 (6th Cir. 2004).

As to systematic exclusion, I suggest that the instant case presents a more clear example of exclusion "inherent in the particular jury-selection process utilized" than that in *Smith*. *Duren*, 439 U.S. at 366, 368 n.26. The evidence reveals that the exclusion was due to the confluence between entry of an erroneous population parameter (118,169), which understated the county population by 3.8 times, and the fact that the state file listed names in zip code order, from lowest to highest, where the lower zip codes represent areas outside the Grand Rapids metro area which have a much smaller African American population. (Doc. 46, Ex. 2 at 15-16.) Although the genesis of the erroneous population parameter of 118,169 remains unknown, I suggest that the parameter itself is systematic and inherent in the selection process. *See United States v. Jackman*, 46 F.3d 1240, 1242-43 (2nd Cir. 1995) (recalling original systematic exclusion whereby jury questionnaires were not sent to Hartford residents because a computer programming error had caused the letter 'd' in 'Hartford' to communicate to the computer that all potential jurors from Hartford were deceased

11

and thus unavailable for jury service).[9]  I further suggest that the file given from the state to the county, in zip code order, is also systematic and inherent in the process.

Accordingly, I suggest that Petitioners have presented established a *prima facie* case of underrepresentation in violation of the Sixth Amendment's fair cross section requirement.


### III.     REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2).  *See also* 28 U.S.C. § 636(b)(1). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).

---

[9]The case analyzed a later plan which allowed the jury clerk to omit certain names from the "picking list," e.g., names of jurors who had served the previous month. *Id.* at 1243.  If the jury clerk did not have enough names on the "picking list," then the clerk would supplement that list with additional names from the new qualified wheel that included Hartford and New Britain. *Id.* at 1244.  The court held that defendant established his *prima facie* case and that the government failed to rebut his showing. *Id.* at 1248.

12

The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.

                                                        s/ *Charles E Binder*
                                                    CHARLES E. BINDER
Dated: January 15, 2010                    United States Magistrate Judge

### **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed in each case on this date, electronically served on Bradley Hall, Kenneth Sasse and Debra Gagliardi, and served on District Judge Lawson and District Judge Ludington in the traditional manner.

Date: January 15, 2010                By    s/*Jean L. Broucek*
                                                     Case Manager to Magistrate Judge Binder