UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS PARKS,

                Petitioner,                Case Number 05-10036
                                                      Honorable David M. Lawson
v.                                                    Magistrate Judge Charles E. Binder

MILLICENT WARREN,

                Respondent.
_____/

**OPINION AND ORDER REJECTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION, OVERRULING RESPONDENT'S
OBJECTIONS, AND DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This case is before the Court once again on objections to a report and recommendation filed by Magistrate Judge Charles E. Binder. Petitioner Curtis Parks filed a petition for writ of habeas corpus challenging his convictions of three counts of first-degree criminal sexual conduct in the Kent County, Michigan circuit court in October 2001. The petition raised four issues for resolution: minorities were systematically excluded from the jury array, which resulted in the denial of a fair cross section of the community on the petitioner's trial jury; the state prosecutor abused the jury selection process by using his peremptory challenges to exclude African Americans from the jury; the petitioner's trial counsel was ineffective for failing to mount a timely objection to the prosecutor's conduct; and the petitioner was denied a fair trial when the state court allowed the prosecutor to introduce a mug shot in evidence. Judge Binder originally recommended denying the petition, and over the petitioner's objections, the Court adopted the report as to all but the jury array issue. As to that issue, the Court referred the matter back to Judge Binder to conduct an evidentiary hearing. Judge Binder consolidated this case with another habeas case that raised a similar challenge and held a joint hearing. Thereafter, Judge Binder issued a report recommending that the

petitioner's "claim[] that [he] was denied [his] Sixth Amendment rights to a fair and impartial jury drawn from a fair cross-section of the community be allowed to proceed because [the petitioner has] established a *prima facie* case." R&R at 1 Jan. 15, 2010). The respondent filed objections.

I.

The facts of the case have been discussed by the magistrate judge and this Court in prior filings. The essence of the case is a charge of sexual assault by the petitioner. The victim claims that the petitioner penetrated her three times against her will, and the petitioner asserted that the sexual encounter was consensual in exchange for money. A Kent County jury rejected the petitioner's version and convicted him. The petitioner was sentenced on November 29, 2001 to a prison term of fifteen to forty years.

At the state trial, the petitioner did not object to the jury array. While the case was pending on direct appeal, a report surfaced that a computer error by the Kent County jury department resulted in the exclusion from jury service of Zip Code sections of the county that corresponded to the highest concentration of African Americans in the population. The petitioner moved in the state court of appeals to remand the case to develop a factual record. It does not appear that the court of appeals ruled on that motion; instead that court declined to reach the issue of under-representation of minorities because the petitioner did not raise the issue in the trial court, and his attorney stated that he was satisfied with the jury when asked if he desired to exercise further peremptory challenges.

In its prior opinion, this Court rejected the respondent's contention that review of the fair cross-section issue was barred because an adequate and independent state ground supported the state court judgment. The Court found cause for departing from the state procedural rule, explaining:

> The petitioner could not have known of Kent County's computer deviation at or before the time of jury selection. County officials did not even know about it, having discovered it several months after the petitioner's trial. "A habeas petitioner shows 'cause' where he demonstrates that he failed to raise a constitutional issue because it was 'reasonably unknown to him' at the time." *Fautenberry v. Mitchell*, 515 F.3d 614, 629 (6th Cir. 2008) (quoting *Amadeo v. Zant*, 486 U.S. 214, 222 (1988)); *see also Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002) ("Cause is shown when the factual basis of the claim was 'reasonably unknown' to the defendant's counsel."). The petitioner has established cause.

*Parks v. Warren*, 574 F. Supp. 2d 737, 744 (E.D. Mich. 2008). After finding that prejudice was presumed, the Court referred the matter for an evidentiary hearing and ordered that counsel be appointed for the petitioner.

II.

In the single issue that remains in the habeas petition, the petitioner contends that African Americans were systematically excluded from the jury venire from which his trial jury was selected in the Kent County circuit court. From the evidence presented to Judge Binder at the evidentiary hearing, it appears that the petitioner is correct.

After appointing counsel from the Flint, Michigan Federal Defender Office, Judge Binder held an evidentiary hearing on October 26, 2009, during which he heard the testimony of only one witness – Wayne Bentley, a Grand Rapids Public Schools teacher who since 1998 has been a member of the Kent County Jury Commission, which oversees the Kent County jury processes. In addition, Judge Binder received several exhibits, including: (a) the November 14, 2007 deposition testimony of Kent County circuit court case management manager Terry Holtrop, which was taken in a different habeas case; (b) a Kent County Jury Management System Report dated August 1, 2002 describing the computer error; (c) a report by expert witness Paul L. Stephenson, III, Ph.D. prepared

for a case in the Kent County Circuit Court, *People v. Bryant*, No. 01-08625; and (d) a report prepared by the petitioner's expert witness Edward Rothman, Ph.D. *See* dkts. # 46, 51.

Wayne Bentley testified that for ten years, he sent students from his government class to the Kent County circuit court to "go into the jury assembly room and count the minorities in the pool." Evid. Hr'g Tr. [dkt. # 48], at 15. "[F]or the better part of ten years, at least once a month we counted minority jurors every day for that month, and we did it right on through 2003." *Ibid.* Bentley described several irregularities in the Kent County jury system, but the one that has direct relevance to the petitioner's October 2001 trial had its origin in the summer of 2001. Bentley testified that is when he noticed the absence of African Americans from jury venires. That prompted Bentley to file a FOIA request asking for addresses of all jurors summoned for a potential pool. After he received and analyzed the response, he learned that minority representation for the residents from the 49507 Zip Code area, which is the second largest population zip code, and has ninety percent African-American population, was "8.4 standard deviations below the norm," while representation of residents from the 49343 zip code, which is a predominantly white suburb of Rockford, was "4.7 standard deviations above the norm." *Id*. at 27, 36.

Ultimately, a computer error was found to be the culprit. Terry Holtrop, a case management manager from the Kent County, testified that after Bentley raised his concerns during Kent County Jury Commission meetings, the issue "came to a head" in September 2001, after Bentley became "very vocal about it." Evid. Hr'g Ex. 1 [dkt. # 46] (Holtrop dep.) at 9. Holtrop described the computer error as follows:

> My understanding is that a programmer, not intentionally, pulled — only pulled jurors from basically two zip codes, I believe, instead of the entire county. So that resulted in most of the jurors being summoned from an area that is considered mostly white.

*Id*. at 21. Holtrop explained that out of approximately 450,000 residents in the county, the program selected only 118,000, *id*. at 21-22, as a result of which "not only were the jurors geographically skewed, but they tended to be ethnically skewed as well." *Id*. at 23.

On August 1, 2002, Kent County IT department issued a report, which contained the most exhaustive explanation of the computer error. The report explained:

> Beginning in 2001, Kent County Information Technology (KCIT) began a project, using County IT staff, to move this entire process of updating and loading the State File into an Oracle database. The reasons behind this move were 1) cost cutting – to eliminate the annual payment to ACS for this effort and 2) timeliness – in that we were dealing with a vendor at a remote location and there was a significant lead-time requirement in getting an updated State File returned to Kent County so that it was available in jury p[ools]. The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 prospective jurors on the file.
> It has been determined that in the initial set-up of the Oracle database to accommodate the driver's license and State ID data from the State File, an error was made in one parameter. Whether this was a programming error, the carry-over of a setting that existed within the Sybase database, misinterpreting instructions, or simply human error, that is now almost impossible to determine. The parameter that was entered within the database was 118,169. What should have been inserted within this setting was the total number of records in the State File, or 453,981 in 2001.
> The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 prospective jurors on the file. The percentage of jurors selected per Zip Code was proportional to the Zip Code composition of the first 118,169 records — but not Kent County as a whole. . . .
> The next logical question being, why then did the jury p[ool] from Zip Code 49341 jump so dramatically for 2001, from an average of 3.8% up to 10.24% . . . and why did the jury p[ools] from Zip Code 49507 decline from an average of 8.56% to 2.13%?
> The answer being that in 1998 . . . the State File did not come in random order, but rather in Zip Code order. . . lowest numbers to highest numbers. In subsequent years, new prospective jurors (either based on age or having moved to the County) were added to the end of the dataset. Existing prospective jurors (those that were on the file the previous year) would simply have address information updated based on what the State provided. Their position in the dataset would not change. Therefore, the first 118,169 records of the dataset have a high percent of the lower numbered zip codes. As is indicated on the map included in this packet, all the

> Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.
>
> . . .
>
> In 2001, the process of changing databases from the Jury Management System . . . was the genesis behind a mistake that was made in the database configuration. An incorrect parameter "told" the jury selection software that the total available pool size was only 118,169 individuals, when in fact it was much larger. The random selection process on the 118,169 records was proportionately correct for that pool size, but not the County in total.
>
> For the time period of April 2001 to July 2002, the number of jurors pulled from Zip Codes that began with 493. . . was larger than normal, on a proportional basis.

Report: Kent County Jury Management System, Aug. 1, 2002 [dkt. # 46], at 3-4.

According to Holtrop, once the problem was corrected in mid-2002, there was a discernible increase in minority participation. *Id.* at 52; *see also* Jury Management Study Kent County, Michigan, Rev. July 1, 2003, Ex. 6 to Holtrop dep., Evid. Hr'g [dkt. # 46], at 9 ("The problem has been recognized and has been resolved. Panels selected after August 2002 should not have the zip code bias."). After the problem was eliminated, the "Black representation went from 2.89% to 4.9% of the respondents." Jury Management Study Kent County, Michigan., Ex. 6 to Holtrop dep., at 16.

The record in this case contains reports by two expert witnesses. The first report is by Paul L. Stephenson III, Ph.D., which was made for Kent County Circuit Court Judge Dennis Kolenda in the case of *People v. Bryant*, Kent County Docket No. 01-08625-FJ, and covers only January 2002, the month of Bryant's jury selection. Citing the 2000 United States Census data, Dr. Stephenson determined that 8.2 percent of the Kent County population of 18 years and older is Black or African American, either alone or in combination with one or more other races. Paul L. Stephenson III, Ph.D., *A Statistical Analysis regarding the Potential Systematic Exclusion of Black or African Americans in the Jury Pools for the Kent County Circuit Court in Jan. of 2002*, Evid. Hr'g Ex. 2 [dkt. # 46]. Out of 45 potential jurors who were selected for the venire in Bryant's case, only one

was Black or African American. Stephenson concluded that "there is a 6.03 percent difference between the percentage of eligible Black and African Americans in Kent County and the actual percentage in the venire." *Id*. at 45. Comparing this disparity to the population as a whole, Stephenson found that the venire for Bryant's trial had 73.1 percent fewer Black or African American members than could have been expected in Kent County. Dr. Stephenson opined that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased," and "all the areas in Kent County with zip codes less than or equal to 49504 were underrepresented." *Id*. at 47-48. However, despite concluding that "systematic bias did exist in the selection of individuals summoned for jury duty during the first three months of 2002, . . .[which] would have inevitably led to the under representation of Black or African Americans in the terms during this period of time," *id*. at 49, Dr. Stephenson opined that since the venire in *People v. Bryant* contained at least one Black or African American potential juror, "there is insufficient evidence to conclude that the venire in this case was significantly biased." *Id*. at 49.

The petitioner's expert witness, Dr. Edward B. Rothman of the University of Michigan, calculated the difference in the number of African Americans in the population and those in the jury pools from April 2001 through August 2002 to be 3.45 percent, which translated into a 42 percent decrease in the likelihood that African Americans would be found in the jury pool during that time period compared with what their census population suggests it should be. Report of Dr. Edward Rothman, Ex. to Evid. Hr'g [dkt. # 51], at 1-2. Dr. Rothman noted a "sharp change from April 2001 through August 2002" in the number of African Americans on the jury roll, and another change after August 2002. *Id*. at 7; *see also id*. at 9 ("The average estimated proportion of African Americans

or Hispanics has decreased substantially from the January 1998 through March 2001 time period to the April 2001 through August 2002 time period. The difference is statistically significant. . . .").

III.

The respondent objected to the magistrate judge's report and recommendation on three grounds. First, she attempted to revive the procedural default argument, on which the Court already ruled. Second, the respondent discussed the statistical evidence and contended that it did not establish significant under-representation of minorities. Third, she takes issue with the magistrate judge's conclusion that the exclusion of minorities from the petitioner's jury venire was systematic.

Objections to a report and recommendation are reviewed *de novo*. 28 U.S.C. § 636(b)(1). The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection requirement." *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006). "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir.1995). "'[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings . . . believed [to be] in error' are too general." *Spencer*, 449 F.3d at 725 (quoting *Miller*, 50 F.3d at 380).

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

This narrow standard of review does not apply when the state court does not address a constitutional claim on the merits. The Sixth Circuit recently stated that a "state court may have various reasons for denying an application for leave to appeal 'for lack of merit in the grounds presented,'" but a federal court cannot "discern from that language alone whether that decision was based on the merits of the case." *Dorn v. Lafler*, 601 F.3d 439, 443 (6th Cir. 2010). Where the federal court is unable to "conclude that it was an 'adjudication on the merits' pursuant to 28 U.S.C. § 2254(d)," as here, *de novo* review is appropriate. *Ibid*. The approach espoused by *Dorn* was called into doubt by *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), which held that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" 131 S. Ct. at 785. The Supreme Court stated that when a claim is presented for adjudication to a state court, there is a presumption "that the state court adjudicated

the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 784-85. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

Regardless of the continued validity of *Dorn v. Lafler*, the presumption has been overcome in this case. The state court expressly declined to reach the merits of the fair representation claim due to lack of objection to the venire in the trial court. When a state court declines to address the merits of an issue, this Court conducts an independent review. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The deferential standard of review prescribed by the AEDPA does not apply because "[t]his statute by its own terms is applicable only to habeas claims that were adjudicated on the merits in State court . . . . Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition . . . questions of law and mixed questions of law and fact [are reviewed] de novo." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (quotations and citations omitted). This Court's review of the petitioner's claims are "not circumscribed by a state court conclusion" because none of the state courts issued a reasoned opinion on the issues. *Wiggins*, 539 U.S. at 534; *see also Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005).

The petitioner's main argument is that he was denied his right to a proper jury as guaranteed by the Sixth Amendment. That amendment "secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, --- U.S. ---, ---, 130 S. Ct. 1382, 1387 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975). In order to establish a *prima facie* violation of the fair cross section requirement, the petitioner must prove three elements: "(1) that the group alleged to have been excluded is a 'distinctive group' in the community; (2) that the representation of that group in venires from which

juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). If the petitioner makes out a *prima facie* violation, the burden shifts to the State to show a "significant state interest [that is] manifestly and primarily advanced by those aspects of the jury-selection systems, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id*. at 367-68.

Throughout this case, the parties have agreed that African Americans comprise a "distinctive group" in Kent County, satisfying the first element of a *prima facie* violation.

The respondent takes issue with the finding that exclusion of African Americans from the jury pool was "systematic." That element was the focus of the Supreme Court's decision in *Berghuis v. Smith*, which also dealt with an underrepresentation claim originating in Kent County. In *Smith*, however, the underrepresentation resulted from the now-discarded practice of allocating jurors from a county-wide pool to the county's local district courts first, and then assigning the remainder to the circuit court. That practice, known as "siphoning," tended to deplete the minority members in the jury pool before it reached the circuit court. The Michigan Supreme Court found that the defendant had not shown that underrepresentation was due to systematic exclusion because his evidence "did not show 'how the alleged siphoning of African American jurors to district courts affected the circuit court jury pool.'" *Smith*, 130 S. Ct. at 1391 (quoting *People v. Smith*, 463 Mich. 199, 205, 615 N.W.2d 1, 3 (2000)). Applying the AEDPA's deferential standard of review, the Supreme Court held that the Sixth Circuit erred in ordering habeas relief because Smith, in fact, did not show that the siphoning practice adversely affected minority jury participation. *See id.* at 1394

("Although the record established that some officials and others in Kent County *believed* that the assignment order created racial disparities, and the County reversed the order in response, *supra*, at 1389-1390, the belief was not substantiated by Smith's evidence."). Smith offered in evidence only that when the siphoning practice was discontinued, the comparative underrepresentation of minorities declined from 18% to 15.1%.

The evidence in this case is different. First, the statistical evidence in the present case is compelling. The comparative disparity — which measures the *un*likelihood of minorities participating on jury service compared to the percentage of minorities in the general popuilation — was substantial: 42 percent (according to Dr. Rothman's report) and 73.1 percent (according to Dr. Stephenson's report for January 2002). *See United States v. Rogers*, 73 F.3d 774, 777 (8th Cir. 1996) (finding comparative disparity of over 30 percent to meet the underrepresentation prong of the *Duren* test where African Americans comprised only 1.87 percent of the jury-eligible population).

Second, there is evidence that exclusion of the African American population from Kent County juries lasted for several months and became noticeable to an ordinary observer. Wayne Bentley testified that during the summer of 2001, he noticed the absence of African American jurors from jury venires and would rarely see a jury venire that contained three percent of African-American members. Other jury commissioners likewise commented on the lack of minority jurors in the pools continuing into 2002. Dr. Rothman's report captures the dip in the presence of African American jurors in the Kent County jury pools from April 2001 through July 2002 in the following table:

-12-



Rothman Rep. at 7. As demonstrated, Dr. Rothman noted "a sharp [decrease] from April 2001 through August 2002" in the number of African Americans on jury venires, and a return to pre-computer-error percentages in August 2002 after the defect was corrected.

Third, the finding of systematic exclusion of minorities from Kent County juries for the relevant period was endorsed by the state. *See People v. Bryant*, No. 280073, --- N.W.2d ---, 2010 WL 2836119 (Mich. Ct. App. July 20, 2010). Just this term, the Supreme Court has reiterated that "the basic structure of federal habeas jurisdiction [is] designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington*, 131 S. Ct. at 787. That fundamental tenet is not upset when a federal court aligns itself with a state court finding on the same issue presented for adjudication. In *Bryant*, the Michigan Court of Appeals found Kent County's system of selecting prospective jurors cause underrepresentation of minorities because of the computer error discussed above. Commenting on the comparative disparity, that

court stated: "Seventy-three and one tenth percent is a significant comparative disparity and is sufficient to demonstrate that the representation of African-Americans in the venire for defendant's trial was unfair and unreasonable." *Bryant*, 2010 WL 2836119 at *4. The court then held:

> We find that the underrepresentation in this case was the result of the system by which juries in Kent County were selected because jurors from zip codes with small minority populations were routinely over selected and jurors from zip codes with large minority populations were routinely under selected because of a glitch or problem with the computer program that selected jurors. Because of this problem with the computer program, underrepresentation was inherent in the jury-selection process utilized in Kent County during the time that the computer glitch existed.

*Id.* at *5-6.

The respondent also challenges the magistrate judge's determination that the statistical evidence established significant under-representation of minorities. The respondent did not address the impact of the Supreme Court's decision in *Berghuis v. Smith* on this case, having filed her objections before the decision came down and not bothering to supplement the State's filings after the case was decided. Instead, she cited *United States v. Buchanan*, 213 F.3d 302, 310 (6th Cir. 2000), for the proposition that an absolute disparity of 1.72 percent and comparative disparity of 37.54 percent are insufficient to prove underrepresentation. In *Smith*, the Court discussed the various statistical tests that have been used to measure underrepresentation, noting that each was "imperfect." *Smith*, 130 S. Ct. at 1393. And the Court refused to "take sides today on the method . . . by which underrepresentation is appropriately measured." *Id.* at 1393-94. The Court did not criticize the state supreme court's "case-by-case approach" in which "the results of all the tests [should be considered]." *Id.* at 1393 (quoting *Smith*, 463 Mich at 204, 615 N.W.2d at 3). The magistrate judge in this case heard evidence of the absolute disparity and the comparative disparity tests, and also evaluated the results of the standard deviation test, the binomial test, and the Chi-

-14-

square-goodness-of-fit test. He concluded that the statistical evidence taken as a whole as presented by Drs. Stephenson and Rothman was compelling and established underrepresentation. To the extent that the finding addresses the statistical evidence, the Court agrees.

The respondent also asks the Court to revisit its holding that the claim is not barred by the doctrine of procedural default. She cites cases from the Western District upholding that procedural defense in cases raising the underrepresentation issue arising from Kent County during the appropriate time. *Burros v. Curtin*, No. 1:05cv701, 2009 WL 736066 (W.D. Mich. Mar. 31, 2009); *Wellborn v. Berghuis*, No. 1:05-CV-346, 2009 WL 891708 (W.D. Mich. Mar. 31, 2009); *Davis v. Jones*, No. 1:04-cv-294, 2007 WL 2873041 (W.D. Mich. Sept. 26, 2007). The common theme of those cases is that the petitioner could not establish cause for not raising an objection to the jury venire at the time of trial because in each case, the petitioner was confronted by an all-white jury (or a final jury with one minority member); and although the cause (a computer error) may not have been apparent, the result should have piqued his awareness of the issue. Without accepting the soundness of that rationale, those cases can be distinguished here because the petitioner's jury venire included significantly more minority members than in the three cases cited above. The rationale expressed by the magistrate judge in *Burros*, which is representative of the three cases, is that the lack of knowledge of a computer error could not amount to "cause" for failure to object at trial, since "[s]imply seeing an array when the deficiency is apparent provides adequate notice," and the petitioner and his trial counsel "were placed on notice of the basis of his claim as soon as they viewed the jury array." *Burros*, 2009 WL 736066 at *9. However, with the small minority population in Kent County at the outset, and with all-white juries commonplace, the absence of minority jurors (or in Burros's case, a trial jury with one minority member) can hardly serve notice

-15-

of a "defect" in the jury selection procedure, which also eluded county officials for a significant period of time. The defect was too subtle to detect by any reasonable means, and the petitioner's conduct amply rebuts any suggestion that he was attempting to bypass deliberately the state courts in seeking adjudication of this issue. *See Amadeo v. Zant*, 486 U.S. 214, 223-26 (1988). In all events, the time for seeking reconsideration has long past, *see* E.D. Mich. LR 7.1(h)(1) (establishing a 14-day deadline for reconsideration motions), and the respondent has not shown that the Court's initial determination was erroneous.

Ironically, however, it is that very point that compels the Court to deny the petition on this claim. The state appellate court record in this case includes affidavits filed by the petitioner in support of a motion to remand his case to the trial court to develop a record on his jury composition claims. *See* dkt. no. 16-3 at 22-28. It also includes U.S. Census data for Kent County during the relevant period. The four affidavits establish that the petitioner was tried by an all-white jury. But they also show that four African Americans were included in the jury venire, although they were removed from the trial jury by the State's peremptory challenges. In the jury venire of 45 people, the affidavits demonstrate that the minority composition of the petitioner's jury venire was 8.89%. According to the census data, Kent County's total population of 574,375 people included 51,287 African Americans. Remarkably, the minority percentage of the Kent County population was 8.93%. Therefore, the racial composition of the petitioner's jury venire reflected almost exactly the proportion of minorities in the community.

The respondent never brought these facts to the Court's attention at any stage of the proceedings. The Court believes that the facts are dispositive of the underrepresentation issue in this case. The Sixth Amendment requires "the selection of a petit jury from a representative cross

-16-

section of the community . . . ," *Taylor*, 419 U.S. at 528, nothing more.  The Supreme Court has consistently maintained that the States have "much leeway" in the application of that requirement. *Id.* at 537-38; *see also Smith*, 130 S. Ct. at 1389.  A system that consistently produces jury venires that underrepresent distinctive groups in the community falls outside that generous territory.  But even with a flawed system, if in a given case "it may be fairly said that the jury lists or panels are representative of the community," *Taylor*, 419 U.S. at 528, the Sixth Amendment fair representation requirement is satisfied.  And in no case is it "require[d] that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."  *Ibid.*

Statistical evidence certainly is a valid means of proving that a jury selection system is fatally flawed.  *See Duren*, 439 U.S. at 364-65 (holding that "[t]he second prong of the prima facie case was established by petitioner's statistical presentation").  And as noted above, the statistical evidence is compelling in this case.  But when the inference commanded by the statistics is rebutted conclusively by the hard evidence on the ground, the statistical inference cannot prevail.  As it turns out in this case, Kent County's flawed system yielded a constitutionally acceptable result, perhaps by happenstance, but an acceptable result nonetheless.  The second element of *Duren*'s test requires that a criminal defendant claiming a fair cross-section violation to prove that "the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community."  *Id.* at 364.  The evidence in the state court record does not permit that finding.

### IV.

The Court cannot disagree with the thorough analysis found in Magistrate Judge Binder's report and recommendation.  He studiously discussed the statistical evidence presented at the

-17-

evidentiary hearing and drew sound conclusions from the facts presented. The respondent's objections to the report lack merit. The Court is puzzled by the respondent's failure to include in its briefing or presentation the compelling evidence from the state court record on file that is so crucial to the proper determination of the fair cross-section issue. Had the respondent come forward with that evidence the time and expense of the hearing in this case may have been avoided. Nonetheless, that evidence requires a finding that the petitioner was not denied a jury chosen from a pool that represents a fair cross-section of the community in which his trial took place.

Accordingly, it is **ORDERED** that the magistrate judge's report and recommendation [dkt. #57] is **REJECTED**.

It is further **ORDERED** that the respondent's objections to the report and recommendation [dkt #58] are **OVERRULED**.

It is further **ORDERED** that the petition for writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: February 28, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 28, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL

---