UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS PARKS,

                Petitioner,              Case Number 05-10036
                                          Honorable David M. Lawson
v.                                      Magistrate Judge Charles E. Binder

MILLICENT WARREN,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR
## WRIT OF HABEAS CORPUS (AFTER REMAND)

This case is before the Court once again, this time after remand by the court of appeals. The Court had denied the petition, addressing primarily the question whether a computer glitch by the Kent County, Michigan jury clerk resulting in systematic exclusion of minority jurors from the jury pool denied the petitioner his right to a jury composed of a fair cross-section of the community, as guaranteed by the Sixth Amendment. *Parks v. Warren*, 773 F. Supp. 2d 715 (E.D. Mich. 2011), *on reconsideration in part*, No. 05-10036, 2011 WL 5838486 (E.D. Mich. Nov. 21, 2011), *abrogated by Garcia-Dorantes v. Warren*, 978 F. Supp. 2d 815 (E.D. Mich. 2013), *vacated* No. 11-2531 (6th Cir. Feb. 18, 2014). The Court also rejected the petitioner's challenge to the prosecutor's use of peremptory challenges of minority jurors asserted under *Batson v. Kentucky*, 476 U.S. 79 (1986).

When addressing the petitioner's fair cross-section claim, this Court held that such a defect amounted to a structural error, absolving the petitioner of the obligation to prove prejudice. The Court denied the claim nonetheless, because the statistical evidence failed to show that "the representation of [the excluded] group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Parks*, 773 F. Supp. 2d at

727 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).  Since that time, however, the court of appeals has held that even if the Kent County aberration, which was addrressed in other federal habeas cases as well, was a structural error, a habeas petitioner must show prejudice to overcome a procedural-default defense asserted by the state.  *See Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012).  The court of appeals remanded this case so this Court could address the issue of prejudice.  The court of appeals also observed that when considering the petitioner's *Batson* issue, this court overlooked a *voir dire* transcript that was in the record.  The remand instruction allowed this Court to "consider any arguments Parks may wish to make" on that issue.

The Court has reviewed the record and concludes that no prejudice has been demonstrated that would entitle the petitioner to habeas relief on his fair cross-section argument.  The Court also has reviewed the *voir dire* transcript and finds no merit in the *Batson* issue.  Therefore, the petition for writ of habeas corpus will be denied.

I

The petitioner did not raise either his fair cross-section claim or his *Batson* challenge in the state trial court, and therefore the issue of procedural default was central to this Court's previous decisions.  A procedural default is "a critical failure to comply with state procedural law."  *Trest v. Cain*, 522 U.S. 87, 89 (1997).  It will bar consideration of the merits of a federal claim if the state rule is actually enforced and is an adequate and independent ground for the state court's decision.  *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).  A procedural default can be excused by a showing of cause and prejudice.  *Coleman*, 501 U.S. at 750.  The Court has found cause to excuse the petitioner's lack of objection to the fair cross-section claim, and there is no reason to revisit that determination.  To show prejudice, the petitioner

must show that a "careful review of [the] trial record indicates that there is a reasonable probability that a different jury would have reached a different result." *Ambrose*, 684 F.3d at 649 (citing *Francis v. Henderson*, 425 U.S. 536 (1976)); *id.* at 598, 599 n.8 ("The question is not whether the petitioner missed his chance to stand trial before a more merciful jury panel or a panel with a particular racial balance, but rather whether there is a reasonable probability that a different jury would have reached a different result." (quotations omitted)). "The most important aspect to the inquiry is the strength of the case against the defendant." *Id.* at 593. If the Court finds that the trial record shows "a case against [the petitioner] so strong, and [a] defense so weak, that [it would be] highly improbable that an unbiased jury could acquit," then "actual prejudice would not be shown." *Id.* at 593-94 (quotations and citations omitted).

The proper determination of prejudice, therefore, requires a review of the trial evidence.

## II.

The essence of the case is a charge of sexual assault by the petitioner. The victim, Beverly Jefferson, claimed that the petitioner penetrated her three times against her will, and the petitioner asserted that the sexual encounter was consensual in exchange for money. A Kent County, Michigan jury rejected the petitioner's version and convicted him. The petitioner was sentenced on November 29, 2001 to a prison term of fifteen to forty years. He was released on parole on April 21, 2016, and his term of supervised release presently is set to end on April 21, 2018.

### A. Beverly Jefferson

At trial, complainant Beverly Jefferson testified that, on the morning of April 22, 2001, she was roused from bed by a loud knock at her door. Trial Tr. Vol. II at 56 (Oct. 16, 2001) (Pg ID 246). Jefferson opened the door and encountered a man, whom she had not met before and did not

recognize, but whom she identified at trial as Parks, who asked to use her phone. *Id.* at 57, 63.
Jefferson allowed the man to enter, and directed him to a sofa in the front room, where he sat down
and made two calls. *Id.* at 57-58.

After Parks finished using the phone, Jefferson told him it was time for him to leave, and in
response Parks "stood up, and he came around [the] coffee table, and he hit [Jefferson] in the
mouth." *Id.* at 60. Jefferson fell down between the sofa and a chair, and Parks then hit her again.
*Ibid.* Jefferson asked Parks if he was going to rape her, and Parks responded by telling her to take
off her pants, or he would hit her again. *Id.* at 60-61. Parks took a condom out of his pocket, told
Jefferson to lay on the floor, and proceeded to rape her. *Id.* at 61.

After Parks was done, Jefferson asked if she could go to the bathroom and if Parks would
help her up from the floor. *Id.* at 61-62. Parks then followed Jefferson through the kitchen toward
the bathroom, and on her way through the kitchen Jefferson grabbed a knife and "ran at him with
it." *Id.* at 62. Parks ran into the bedroom as Jefferson pursued him with the knife, telling him
repeatedly to leave. *Id.* at 62-63. Parks seized a laundry basket full of clothes from the bedroom
and used it to fend off Jefferson's advance by swinging the basket around until the clothes flew out
and the handle broke off the basket. *Id.* at 63-64. At some point the two wound up back in the front
room, where Parks told Jefferson he was not going to leave, and that he would break her TV and
VCR. *Id.* at 64-65. Jefferson then desisted and put down the knife, because she did not want Parks
to further ravage her home. *Id.* at 65.

Parks then told Jefferson to give him the knife, which she did, and then he told her to go to
the bedroom, where he had sex with her again and made her perform oral sex on him. *Id.* at 65-67.
While they were in the bedroom, Parks told Jefferson, "I've been watching you a long time," and

"I really like you." *Id.* at 67. Parks then fell into a state of half-sleep on the bed, nodding in and out, with the knife still in his hand. *Id.* at 68. Eventually Parks fell fully asleep and the knife slipped out of his hand, at which point Jefferson seized the knife, went to the front room, dialed 911, told the police she had been raped, and asked them to send an officer immediately. *Id.* at 68-69.

While she waited for the police, Jefferson heard Parks begin to rouse, and she called back and asked the police to hurry because the man who had raped her still was in her house and was waking up. *Id.* at 69-70. Before the police arrived, Parks woke up, came out to the front room, and told Jefferson to get on the floor, where he proceeded to rape her again. *Id.* at 70-71. Jefferson heard police coming up the stairs to her door, and she began screaming, but Parks held his hand over her mouth in an attempt to silence her. *Id.* at 71. The police then kicked in the door and ordered Parks to get off of Jefferson and get down on the ground. *Id.* at 71. After Parks was arrested by the police, Jefferson was taken to the emergency room where she received stitches to close two injuries to her inner and outer lip. *Id.* at 73.

### B. Police and Medical Treaters

Grand Rapids Police Officer Michael LaFave testified that he was dispatched to Jefferson's home around 8:50 p.m., in response to a report of a rape that had just occurred. Trial Tr. Vol. II at 128-29 (Oct. 16, 2001) (Pg ID 264-65). LaFave was on patrol less than a block away from Jefferson's residence, and it took him less than a minute to arrive. *Ibid.* When he arrived, he walked up the stairs and knocked on the door. *Id.* at 129. LaFave heard "some bumping around" inside the apartment, and "a female inside called to [him]" and told him to come in. *Ibid.* LaFave tried the door, but it was locked; when he yelled that the door was locked and he could not enter, the female "tried to scream, a real terrified scream," and again told him to come in. *Ibid.* LaFave then kicked

in the door and, upon entering the apartment, saw Jefferson on her back on the floor and Parks on his knees over her, with his pants around his knees, "doing something sexual." *Ibid.* Parks stood up and lunged at LaFave, who drew his weapon and ordered Parks to get on the ground; Parks looked at LaFave, and then complied. *Id.* at 129-30.

Crime scene technician Julie Chan testified that she was dispatched to Jefferson's apartment around 9:00 a.m. on the morning following the incident. Trial Tr. Vol. III at 22-23 (Oct. 17, 2001) (Pg ID 274). Jefferson was still in the apartment when Chan arrived. *Id.* at 24. Chan photographed the scene and Jefferson's injuries, and she collected a knife from the scene after Jefferson pulled back a rug and showed Chan where it was. *Id.* at 23-24. Chan also collected what appeared to be a used condom, and she dusted the knife and a fan that she found on the bed in the bedroom for fingerprints. *Id.* at 24-27. Jefferson stated that she did not know how the fan got on the bed. *Id.* at 25. Chan did not find any fingerprints on the knife, but she testified that prints she lifted from the fan matched the petitioner. *Id.* at 26-27.

Emergency room doctor Brian Buller testified that he treated Jefferson around 9:55 a.m. on the morning following the incident for a laceration on the inside of her left upper lip, which required stitches to close. Trial Tr. Vol III. at 11-13 (Oct. 17, 2001) (Pg ID 271). Buller stated that the injury appeared to him to be less than twelve hours old. *Id.* at 12.

Sexual assault nurse Suzanne Reiter saw Jefferson at her office around 11:00 a.m. on the morning following the incident. Trial Tr. Vol. II at 38 (Oct. 16, 2001) (Pg ID 242). She noted injuries to Jefferson's mouth that appeared to be "very fresh." *Id.* at 39. Reiter examined Jefferson and noted multiple abrasions and lacerations around her genitalia and anus; she observed that one of the lacerations still was bleeding. *Id.* at 41. Reiter testified based on her experience that the

injuries were "very consistent" with sexual assault, and that "[w]e see this type of injuries a lot with forced sex." *Id.* at 42-43.

## C. Petitioner

Parks testified that he was walking past Jefferson's apartment on his way home, when Jefferson called out to him from her apartment door and told him to come over. Trial Tr. Vol. III at 71-72 (Oct. 17, 2001) (Pg ID 286). According to Parks, Jefferson asked Parks if he had any drugs, but he told her he did not. *Id.* at 72-73. Parks went to leave, but Jefferson said, "hold on," and then, while patting her privates, asked him, "Do you want to hit this mother f****er?" *Id.* at 73. Jefferson proposed an exchange of sex for $20, but Parks replied that he had only $10 with him. *Ibid.* Parks again went to leave, but Jefferson again told him to "hold on," and then she said, "I guess that's going to have to do." *Ibid.*

Parks went into the apartment with Jefferson, and Jefferson sat down on a chair, drinking a beer. *Id.* at 74-75. Parks asked Jefferson where they should have sex, but Jefferson told him to wait and that she would be ready in a bit. *Id.* at 76. Parks noticed a phone in the room and asked Jefferson if he could use it. She said he could, and Parks dialed two or three numbers, but did not complete any calls. *Id.* at 76. Shortly thereafter, Jefferson and Parks went to the bedroom and proceeded to have sex. *Id.* at 77-79. After they had intercourse and Jefferson performed oral sex on him, Parks fell asleep. *Id.* at 83.

When Parks woke up, Jefferson was not in the bedroom. *Id.* at 87. Parks got up and went out to the front room, where he saw Jefferson looking out the window. *Ibid.* Jefferson then yelled at Parks that he had lied to her, and asked if he wasn't going to pay her. *Ibid.* Parks then gave Jefferson some money, and the two got on the floor and began to have sex again. *Id.* at 87-88.

While they were having sex, there was a knock at the door, Parks heard someone outside yell, "police," and then Jefferson started screaming and jumped up. *Id.* at 88. The door then "burst open," and police entered the apartment. *Ibid.* Parks denied that he ever "lunged" at Officer LaFave, and he conceded that his account differed from LaFave's, but he insisted his was more credible "[b]ecause [he] was there." *Ibid.*

Parks stated that Jefferson never threatened him with a knife while he was in the apartment, that he never hit her, and that he never saw any injury on Jefferson's mouth and did not notice any bleeding. *Id.* at 79-81. Parks also admitted that he was drinking and was "high" before he arrived at Jefferson's house. *Id.* at 98-99. Parks stated that he thought Jefferson had become angry and called the police because she thought he wasn't going to pay her, or because she was upset that he fell asleep after they had sex. *Id.* at 102-03.

Parks also called his sister and a friend as character witnesses, who testified that he was "quiet," "truthful," and "pretty mellow." Trial Tr. Vol. III at 113 (Oct. 17, 2001) (Pg ID 297); 116-19 (297-98). One of Jefferson's neighbors testified that he did not hear anything going on in Jefferson's apartment until the police arrived. *Id.* at 60 (Pg ID 283).

### III.

In supplemental briefing, the petitioner argues that he can show "actual prejudice" in this case, because the principal evidence at trial was "he said, she said" testimony produced by the petitioner and his alleged victim about whether the sex they engaged in was consensual, and the various physical injuries to the complainant's person that were observed after the incident plausibly could have occurred during a consensual encounter, or could have been due to a physical altercation with someone other than the petitioner. He also relies on *Garcia-Dorantes v. Warren*, 978 F. Supp.

2d 815 (E.D. Mich. 2013), *aff'd* 801 F.3d 584, 600 (2015), in which this Court found prejudice in another Kent County case that included a fair cross-section claim.

The Court disagrees. The petitioner has failed to establish that he suffered any actual prejudice, because the trial record plainly depicts a case against the petitioner so strong, and a defense so weak, that it is highly improbable that an unbiased jury could acquit him. *Ambrose*, 684 F.3d at 593-94.

The petitioner contends that the trial was merely a "swearing contest." But he disregards the fact that he was outnumbered in that contest by five to one. The complainant and all of the first-responder witnesses gave testimony that consistently and credibly supported the complainant's claim that she was beaten and forcibly raped by the petitioner. The petitioner's self-serving testimony that the encounter was consensual was contradicted by physical evidence of serious injuries to the complainant's person that were consistent with a beating and sexual assault. The petitioner has offered nothing beyond his own speculation to support his claim that her injuries "could have been" due to consensual sex or a physical altercation with someone else. His testimony that he "didn't notice" lacerations to the complainant's face and mouth that required stitches to close, and his claim that she was eager to engage in sex for money with him while suffering thusly, are transparently implausible, and no reasonable jury could be expected to credit it. The petitioner also offered nothing to explain the disrepancies between his testimony and that of the responding officer about what happened when police kicked down the door. The character testimony suggesting that a violent sexual assault was out of the norm for the respondent's behavior bears little weight next to the compelling testimony and physical evidence offered by the state which fully was consistent with the complainant's account. And the neighbor's testimony that he "didn't hear anything going on"

before police arrived does not materially impeach the complainant's story, because the complainant testified that she submitted to the assault due to her fear of the petitioner, and that she did not call out for help until police arrived at her door.

This case is significantly distinguishable from those such as *Garcia-Dorantes*, where the physical circumstances of a violent encounter largely were undisputed, and where the principal question for the jury was the defendant's state of mind, as to which there were no conclusive physical indications. In this case, by contrast, the record is replete with physical evidence and independent witness testimony, which directly contradicted the petitioner's claim that the complainant consented to the sexual encounter, and which supported in every material detail the complainant's story that she was forcibly raped.

The petitioner discusses at length certain testimony by Samuel R. Sommers, Ph.D., which, he contends, "empirically proves" that juries with more African-American jurors statistically are less likely to convict in all cases. The petitioner contends that such evidence is sufficient to support the required finding of "actual prejudice" under the rule announced by the Sixth Circuit in *Ambrose*. However, the Sixth Circuit considered that same statistical evidence and held that it is immaterial to the actual prejudice analysis. *Garcia-Dorantes*, 801 F.3d at 597 ("The district court [] correctly found that Dr. Sommers' expert testimony, in which Dr. Sommers stated that racially diverse juries are less likely to convict than all-white juries, was not relevant to the 'actual prejudice' determination because his testimony: (1) does not support a finding that a different jury would have reached a different result; (2) lacks any individualized assessment of the case against Garcia-Dorantes; and (3) relies on impermissible racial stereotypes.").

The petitioner also advances the position that he has shown prejudice because minority jurors may have been more likely to find plausible the petitioner's testimony that he exchanged money for consensual sex with a drug addict, who later became displeased with the deal and decided to call the police, due to their exposure to that sort of transaction as an incident of daily life in urban environments. However, the Sixth Circuit expressly condemned that avenue of reasoning and rejected this Court's reliance on similar experiential inferences about minority jurors in *Garcia-Dorantes*. *See* 801 F.3d at 599 ("[T]his argument sounds much like the stereotyping arguments courts have sought to avoid, namely that because an individual is black or Hispanic, he is predisposed to better understand, or be sympathetic to, a defendant's case.") (citing *Batson v. Kentucky*, 476 U.S. 79, 104-05 (1986) (Marshall, J., concurring)).

Because the petitioner has not shown actual prejudice, he can not overcome his procedural default. The state's procedural ground for denying relief, therefore, constitutes an adequate and independent ground that is beyond this Court's purview to assess. *Coleman*, 501 U.S. at 729. The petitioner is not entitled to habeas relief on his fair cross-section claim.

## IV.

The petitioner also argues that the prosecutor's peremptory challenges were racially motivated, in violation of the rule in *Batson v. Kentucky*. He also contends that a further evidentiary hearing is warranted to ascertain whether any Hispanic jurors were excluded from the venire, where there is no indication in the record whether or not the venire or the panel included any persons of Hispanic origin, and he argues that exclusion of Hispanic jurors also could establish that he was denied the privilege of a jury selected from a fairly composed venire. And he contends that he is

entitled to an evidentiary hearing to develop a record on the prosecutor's motives for exercising four peremptory challenges against African-American jurors.

The respondent points out that the petitioner's claim that Hispanics were excluded from the venire previously was rejected by the Court, and the petitioner never attempted during these extensive proceedings to amend his petition, or to explore in any depth the exclusion of Hispanic jurors during the evidentiary hearing before the magistrate judge. He also asserts that the *voir dire* transcript from the state trial court, despite the fact that the prosecutor's peremptory challenges were not subject to any objections, does disclose that there were plausible non-racial reasons for the exercise of the challenges to the four African-American jurors, based on (1) one juror's relationship with a relative who was sexually assaulted, and her responses indicating she would expect the state to meet an improperly elevated burden of proof in order to convict, (2) another juror's work with the state's probation department, which involved providing services to defendants accused or convicted of sexual assault, (3) a third juror's occupation as an engineer (which the respondent contends was the same occupation as yet another juror who was excused for cause), and (4) the fact that a fourth juror lived near the crime scene and had heard about the incident before she was called for jury duty. The respondent contends that the petitioner is not entitled to an evidentiary hearing on the *Batson* claim, because, under the rule of *Cullen v. Pinholster*, 563 U.S. 170 (2011), this Court's review of the claim, which was rejected on the merits by the state court of appeals, is confined to consideration of the record that was before the state courts.

The trial record in this case indicates that the prosecutor used peremptory challenges to excuse seven jurors: Roger Elliott, Gregory Scrivens, Thomas Zandbergen, Ahmed Shabazz, Kelli Adane, Aria Moody, and Melanie Gipson (referred to in the transcript by the misnomer "Gibson").

Trial Tr. Vol I at 65-66 (Oct. 15, 2001) (Pg ID 217), 82-83 (221), 99 (225), 105 (227).  The defense exercised peremptory challenges to excuse four jurors.  *Id.* at 75 (Pg ID 219), 95 (224), 107 (227).  The transcript does not indicate how many peremptory challenges the parties were allowed, but state law allowed for twelve challenges for each side.  *See* Mich. Ct. R. 6.412(E).  It is evident that neither side exhausted their full allocation, because both sides passed when asked by the Court the final time whether they had any peremptory challenges. *Id.* at 111-12 (Pg ID 228).

During *voir dire*, the prosecutor asked questions of the jurors about (1) their occupations and the occupations of their spouses and children, *id.* at 32-36 (Pg ID 209); (2) if they had been in situations where they had to decide whether others were telling the truth or lying, *id.* at 39-42 (Pg ID 210-11); (3) if they or any of their friends or relatives had been the victims of sexual assault, *id.* at 42 (Pg ID 211); (4) if they ever were accused of a crime, *id.* at 43-49 (Pg ID 211-213); (5) if they would need proof "100 percent beyond all doubt" to convict, *id.* at 49-51 (Pg ID 213)); (6) if they felt that a victim of sexual assault should have to resist, *id.* at 52 (Pg ID 213); (7) if they would feel uncomfortable discussing the facts of a case about sexual assault, *id.* at 53 (Pg ID 214); and (8) if there was any other reason they could not be impartial, *id.* at 52 (Pg ID 214).

The parties agree that the *voir dire* transcript offers no discernible hints about the prosecutor's reasons for exercising her peremptory challenges, principally because the defendant's attorney did not object to any of the challenges, and at the end of the selection process he stated that "the defense is satisfied with the jury." *Id.* at 112 (Pg ID 228).  It also is undisputed that no reference was made on the record to the race of any members of the venire, or the racial makeup of the jury.

In support of his motion in the state court of appeals to remand the case for an evidentiary hearing on the *Batson* claim, the petitioner submitted affidavits from Ahmed Shabazz, Aria Moody, and Melanie Gipson. Each attested that they were in the venire from which the petitioner's jury was drawn and that they were peremptorily excused by the prosecutor. Pet. Mot. to Remand, Exs. C-E (Mich. Ct. App.) (Pg ID 398-404). Melanie Gipson attested that her cousin, Gregory Scrivens, who is African-American, also was in the venire and was peremptorily excused by the prosecutor. Gipson aff. pp 4-6 (Pg ID 402). Reverend Steven Vanhuizen separately attested that he observed the petitioner's trial and that the "case was tried by an all-white jury." Ex. F, Steven Vanhuizen aff. (Pg ID 404). The petitioner conceded in his motion that "the existing record [did] not reflect how many African-Americans, if any, were in the jury pool or ultimately served on the jury," and that the "record [did] not reflect that the prosecutor exercised peremptory challenges for the purpose of obtaining an all-white jury," but he argued that remand for an evidentiary hearing was warranted to develop an evidentiary record, which he believed would show that "there were [] a small number of African-Americans in [his] jury pool," and "the prosecutor removed each of those African-Americans by peremptory challenge and had a racial purpose for doing so."

As with the fair cross-section claim, the *Batson* claim was procedurally defaulted, because there was no objection in the trial court to the prosecutor's peremptory challenges, and defense counsel expressed satisfaction with the jury panel. To establish cause for the default, the petitioner argues that his attorney was ineffective by failing to object.

Ineffective assistance of counsel may serve as "cause" for a procedural default if it rises to the level of a constitutional violation. *Martin v. Mitchell*, 280 F.3d 594, 605 (6th Cir. 2002). In fact, a "claim of ineffective assistance of counsel . . . can serve as both cause and prejudice, excusing a

procedural default in an underlying substantive claim." *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006). However, to establish constitutionally ineffective assistance of counsel, the petitioner must meet the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance means simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688 ).

## A.

"'[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.'" *Bryan v. Bobby*, 843 F.3d 1099, 1110 (6th Cir. 2016) (quoting *Batson*, 476 U.S. at 89). "The trial court's determination whether the prosecutor is using his peremptory challenges for that improper reason involves three steps. '[O]nce the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a

race-neutral explanation (step two).'" *Ibid.* (quoting *Purkett v. Elem*, 514 U.S. 765, 767 (1995)).
"Step two does not demand an explanation that is 'persuasive, or even plausible,' so long as it is
facially race neutral." *Ibid.* (quoting *Purkett*, 514 U.S. at 767-68). "Although the standard to be met
at this point may be low, the prosecutor is limited to the explanation he gives. No matter that the
trial court or an appellate court may think of better, more plausible, more constitutionally acceptable
reasons for the strike, the only explanation to be analyzed is the explanation the prosecutor in fact
gave." *Ibid.* "If step two is satisfied, 'the trial court must then decide (step three) whether the
opponent of the strike has proved purposeful racial discrimination.'" *Ibid.* (quoting *Purkett*, 514
U.S. at 767). "The critical question here is 'the persuasiveness of the prosecutor's justification for
his peremptory strike' — quite simply, whether the trial court finds the prosecutor's race-neutral
explanations credible or pretextual." (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003)).

"To establish a *prima facie* case [under step one], the defendant must show that (1) he is a
member of a cognizable racial group; (2) the prosecution has removed a member of his race; and (3)
circumstances raise an inference that the removal was motivated by race." *United States v.
Lawrence*, 735 F.3d 385, 443 (6th Cir. 2013)).

The petitioner is not entitled to relief on his *Batson* and *Strickland* claims, because he has
not pointed to any circumstances evident from the record sufficient to make out a *prima facie* claim
that the prosecutor's use of peremptory strikes was racially motivated. And because the record
discloses no plausible basis for raising a *Batson* objection, the petitioner's counsel cannot have been
ineffective for failing to make one.

Before the Court can reach the second or third steps of the *Batson* analysis (determining
whether proffered reasons are facially neutral, and then evaluating whether those reasons are

credible), it must find in the first instance that the petitioner has made an adequate *prima facie* showing to support an inference of purposeful discrimination. Here, it is undisputed that the petitioner is African-American, and the record contains affidavits from three members of the venire whom the prosecutor excused, and who attested that they also are African-American. Therefore, the petitioner adequately has made out the first two elements of a *prima facie Batson* claim. However, he has not pointed to any other circumstances evident from the record sufficient to suggest that the removal of those jurors was "motivated by race."

In this case, essentially the only "circumstance" bearing on the issue of racial motivation that the petitioner points out is that four members of the venire were African-American, and those four members were excused by the prosecutor's peremptory challenges. But it is well-accepted that something more must be shown to establish racial motivation, beyond removal of one or more members of the venire of a certain race. *Hernandez*, 500 U.S. at 361 ("While the prosecutor's criterion might well result in the disproportionate removal of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause."). The Sixth Circuit "has rejected, on multiple occasions, 'a *per se* rule that a showing by the [opponent of the strike] that [a party] used all its peremptory challenges against [a particular race], without more, makes out a *prima facie* case of intentional discrimination.'" *United States v. Harper*, 545 F. App'x 329, 337 (6th Cir. 2013) (citing *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521 (6th Cir. 1988) ("We reject Nelson's underlying premise that an inference of intentional discrimination will always arise if, without more, there is a showing that the prosecution used all its peremptory challenges to exclude blacks.")).

The petitioner here has not pointed to any relevant circumstantial factors evident from the record that could favor an inference of discrimination. "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Batson*, 476 U.S. at 96. "For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* at 97. "Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Ibid.* The Sixth Circuit has held that "it will be relevant to the third and crucial requirement of a *prima facie* case to know: 1) the racial composition of the initial group seated and the final jury panel sworn; 2) the number of peremptory strikes allowed each side; and 3) the race of those who were struck or excused from the jury panel throughout the voir dire (whether for cause or by a peremptory challenge), the order of strikes, and by whom they were exercised. In an appropriate case, it may also be useful to consider evidence as to the percentage of the 'cognizable racial group' in the jury pool, or the racial composition of the district wherein the jury pool is selected." *Sangineto-Miranda*, 859 F.2d at 1520.

There are several reasons why the petitioner's showing here falls short. *First*, there is no information to suggest that the prosecutor engaged in a "pattern" of strikes against African-American jurors. The prosecutor excused seven jurors, and only four of those persons purportedly were African-American. Because the *voir dire* transcript does not contain any mention of the racial makeup of the venire or the seated panel, it is impossible to draw any valid inference that all minority members of the venire were excluded by the prosecutor's challenges.

*Second*, there is no racial pretext evident from the prosecutor's routine questions to the venire about jurors' occupations, disposition toward the parties and the nature of the case, and their

understanding of the burden of proof.  Nor is there any racial pretext suggested by any comments made on the record by counsel, the trial court, or members of the venire.  The affidavits supplied by the petitioner do not suggest any pretext either, because those members of the venire offered nothing more than their racial identities and the fact that they were excused.

*Third*, as noted above, it is impossible to divine the racial makeup of the venire as a whole, beyond the proffered facts that four members of the venire were African-American, and that all of the jurors seated on the panel were white.  But those facts are insufficient in themselves to raise a valid inference of discriminatory intent.  *Sangineto-Miranda*, 859 F.2d at 1521.

*Fourth*, neither side exhausted its challenges to the end of excluding all members of a certain race.

*Fifth*, it is well established by now that the percentage of African-American jurors in the relevant jurisdiction was around 8.9%, which the Court previously observed was the same as the ratio of 4 in 45 members of the venire whom the record suggests were of that race.  But, again, absent other suggestive circumstances, the bare fact that the seated panel had a lower percentage of minority jurors than the jurisdiction as a whole is not sufficient to support any valid inference of purposeful discrimination.

Nevertheless, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."  *Miller-El v. Dretke*, 545 U.S. 231, 240-41(2005).  "It is well established that a *Batson* violation may be shown by disparate treatment of white and minority jurors — that is, if a side-by-side comparison of some black potential jurors who were struck and white ones who were not shows that the only material

distinction between the removed black and the retained white individuals is their race." *United States v. Atkins*, 843 F.3d 625, 631 (6th Cir. 2016) (quotations omitted). In this case, the information available from the record of the *voir dire* convincingly suggests that no such suspect comparisons could be made, since, as the respondent points out, the answers of the four identified venire members on the record reveal valid non-racial reasons to distinguish them from any white jurors who were not discharged, such as occupation, misapprehension of the burden of proof, hesitation in answering inquiries about bias, and the fact that one person resided near the scene of the crime. The petitioner correctly points out that those reasons may not be presumed by the Court to be the actual motivations of the prosecutor, since no reasons for the peremptory challenges ever were offered by her on the record. But as "relevant circumstances" bearing on the adequacy of a *prima facie* showing, those comments by members of the venire convincingly rebut any inference that the only cognizable distinction between minority members of the venire who were excused and non-minority members who were not challenged was racial.

In its decision affirming the petitioner's conviction and rejecting his *Batson* and fair-cross-section challenges, the state court of appeals reasoned as follows:

> Defendant [] argues that his trial counsel was ineffective when he failed to object to the prosecutor's racially discriminatory use of her peremptory challenges. Because defendant failed to move for a new trial or an evidentiary hearing regarding his ineffective assistance claim, this Court's review is limited to mistakes apparent on the record. We find no merit to defendant's argument.

> To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's errors, there was a reasonable probability that the result of the proceeding would have been different.

> No ineffective assistance is evident from the existing record. This Court previously denied defendant's motion for remand, and no evidentiary record exists regarding defendant's ineffective assistance challenge. Further, the transcript of the jury voir

> dire does not provide any information regarding the allegedly faulty computer program and does not indicate the races of the jury venire or the impaneled jury. Nor does the record indicate that the prosecutor exercised her peremptory challenges to remove African-Americans from the jury because of their race. Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. Because there is no record of any wrongdoing, defendant has not sustained his burden of establishing that his trial counsel provided objectively unreasonable assistance, let alone unreasonable assistance that affected the jury's verdict. Therefore, we find no merit to defendant's argument.

*People v. Parks*, No. 239728, 2003 WL 21958299, at *1 (Mich. Ct. App. Aug. 14, 2003). That ruling essentially was a determination that the petitioner had not made out a *prima facie* claim under *Batson*'s step one, and that no further inquiry into the prosecutor's motivation was required. For the reasons discussed above, that was not an unreasonable application of well-established federal law. "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence *sufficient to permit the trial judge to draw an inference that discrimination has occurred.*" *Johnson v. California*, 545 U.S. 162, 170 (2005) (emphasis added). Here, he has not done so.

The petitioner's extensive argument in support of his position that he is entitled to an evidentiary hearing to explore the circumstances of the jury selection in his case is supported by nothing more than his speculation that such an inquiry could produce some evidence of racial motivation sufficient to allow him to raise a valid *Batson* claim. But that sort of naked speculation does not warrant an evidentiary hearing in a habeas proceeding. *Shirley v. Yates*, 807 F.3d 1090, 1105 (9th Cir. 2015) ("'No authority supports the State's claim that pure speculation qualifies as circumstantial evidence of the prosecutor's actual reasons [for exercising a peremptory strike].'" (quoting *Paulino v. Harrison*, 542 F.3d 692, 701 (9th Cir. 2008))); *Woods v. Sinclair*, 764 F.3d 1109, 1128 (9th Cir. 2014) ("It was not unreasonable for the Washington Supreme Court to deny Woods's request for a hearing when all he could offer was speculation that an evidentiary hearing

might produce testimony or other evidence inconsistent with Dr. Brown and MacClaren's declarations."); *c.f. Lancaster v. Adams*, 324 F.3d 423, 435 (6th Cir. 2003) (finding state court's refusal to remand for an evidentiary hearing on the prosecutor's reasons for exercising challenges due to the absence of a *prima facie* showing was unreasonable because the prosecutor had offered reasons for the challenges in response to objections, thus mooting the *Batson* step one inquiry).

As the Court observed in its previous opinion, "[t]he affidavits of the excused jurors simply say that they were excused. To conclude that the prosecutor exercised peremptory challenges on the base of race requires pure speculation. The petitioner has not provided the Court with any facts to support his allegation that the prosecutor acted improperly or that defense counsel's omissions amounted to deficient performance." Order Denying in Part Pet. [dkt. #30] at 8. Nothing in the *voir dire* transcript suggests any good reason to question that conclusion.

### B.

As to the petitioner's *Strickland* claim, which is premised on the failure to raise a *Batson* challenge, petitioner's counsel cannot be found to be ineffective for failing to raise an objection that was not supported in the first instance by any *prima facie* showing adequate to raise a valid inference of purposeful discrimination. *Mitchell v. Rees*, 36 F. App'x 752, 753-54 (6th Cir. 2002) ("The district court's conclusion that the state court record demonstrates ineffective assistance of counsel with regard to the *Batson* issue necessarily depends on the record's demonstrating the existence of a meritorious *Batson* claim.").

### V.

The petitioner has not shown prejudice to excuse his procedural default of his fair cross-section claim. He has shown neither cause nor prejudice on his *Batson* claim.

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is **DENIED**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 28, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 28, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI